*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————————————— :
JAN SCHECHTER, on behalf of himself and all     :
others similarly situated,                      :
                                                :
                    Plaintiff,                  :     Civil Action No. 18-13634 (FLW)
          v.                                    :
                                                :     **OPINION**
HYUNDAI MOTOR AMERICA and HYUNDAI               :
MOTOR COMPANY,                                  :
                                                :
                    Defendants.                 :
—————————————————————————————— :

**WOLFSON, Chief Judge**:

Plaintiff Jan Schechter ("Plaintiff") brings this putative class action, alleging that Hyundai Motor America ("HMA") and Hyundai Motor Company ("HMC") (together, "Defendants"), concealed the fact that certain of its vehicles contained a defective powertrain component. In an Opinion issued on July 29, 2019 (the "prior Opinion"), I granted Defendants' motion to dismiss the original complaint, with the exception of the claims asserted for breach of the express and implied warranties. Plaintiff was also given leave to amend his New Jersey Consumer Fraud Act ("NJCFA") and negligent misrepresentation causes of action, after which he filed the First Amended Complaint ("FAC"). Pending before the Court are the following: (1) Defendants' Motions to dismiss Plaintiff's amended claims and to strike certain portions of the FAC; and (2) Plaintiff's Motion for reconsideration of the prior Opinion. For the reasons expressed herein, Defendants' Motion to dismiss is **GRANTED** and their Motion to strike is **DENIED** as moot. In addition, Plaintiff's Motion for reconsideration is **DENIED**. Plaintiff is

given leave to submit a final amended complaint as to his NJCFA claim within 40 days from the date of this Opinion.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because the relevant background of this matter is set forth in the Court's July 29, 2019 Opinion and Order, I will only recount the necessary facts for the resolution of this Motion. *See Schechter v. Hyundai Motor Am.*, No. 18-13634, 2019 U.S. Dist. LEXIS 126021 (D.N.J. July 29, 2019). HMC is a South Korean corporation that, through its various entities, designs, manufactures, markets, distributes, and sells Hyundai automobiles in the United States. FAC, ¶ 30. HMA, a wholly owned subsidiary of HMC based in California, advertises, markets, and sells Hyundai automobiles nationwide. *Id*. at ¶ 29.

On October 2016, Plaintiff, a New Jersey resident, leased a 2017 Hyundai Santa Fe Sport 2.4L with a listed MSRP of $28,560.00 from Circle Auto Group, an authorized car dealership in New Jersey. *Id*. at ¶¶ 17, 24. According to the FAC, the 2017 Santa Fe Sport 2.4L suffers from a defective powertrain, resulting in "significantly delayed acceleration . . . , loss of power, and rough shifting" (the "Powertrain Defect"). *Id*. at ¶¶ 1, 38. Plaintiff claims that the Powertrain Defect presents an extreme hazard to drivers, because it interferes with a vehicle's ability to "accelerate as expected under normal driving conditions and maintain an appropriate speed based on traffic flow." *Id*. at ¶¶ 5, 38.

Plaintiff alleges that Defendants had knowledge of the Powertrain Defect at the time of his lease, on the basis of various online customer complaints that were posted on the website of the National Highway Transportation Safety Authority ("NHTSA"). *Id*. at ¶¶ 42, 46. The FAC includes quotes from these complaints, some of which predate Plaintiff's lease and relate to the 2017 Hyundai Santa Fe, and others of which post-date his lease and relate to the 2017 Hyundai

Santa Fe Sport 2.4L, his model vehicle. *Id*. at ¶¶ 47, 48. According to Plaintiff, Defendants were aware of these complaints, because Defendants "monitor" the NHTSA's website to discover potential "design or manufacturing defects" in newly manufactured vehicles, and for "online reputation management" purposes. *Id*. at ¶ 51.

The FAC also references two Technical Service Bulletins ("TSB") that were issued on August 2016 and September 2016. The August 2016 TSB pertains to the 2017 Hyundai Santa Fe and states: "[t]his bulletin provides information related to the [transmission control unit] software update for certain 2017 Santa Fe vehicles that may experience a transmission hesitation or shift shock when accelerating at slow speeds." Jeremy H. Ershow Certification, dated August 30, 2019, ("Ershow Cert."), ¶ 2, Exhibit 1.[1] Moreover, the September 2016 Bulletin, which concerns the 2017 Hyundai Santa Fe Sport 2.4L, states: "[t]his bulletin provides a procedure to transfer pressure data to the PCM using GDS mobile. This procedure is necessary to reduce the TCM learning time and improve the shift quality." *Id*. at ¶ 43.

In addition, the FAC cites to a previous class action lawsuit between Defendants and owners of the earlier 2010-2012 Santa Fe model vehicles. *See Reniger v. Hyundai Motor Am.,* No. 14-3612, 2017 U.S. Dist. LEXIS 46003 (N.D. Cal. Mar. 28, 2017) (the "*Reniger* lawsuit"). According to Plaintiff, the *Reniger* lawsuit involved a "similar defect" that caused "unexpected stalling and loss of power while driving," but, after the case settled in 2014, Defendants did nothing to correct these alleged problems in later Santa Fe model vehicles. *Id*. at ¶ 45. Plaintiff

---

[1]     The Court can consider the August 2016 TSB that Defendants have submitted as an exhibit, because the FAC includes a specific reference to this document and it forms the basis of Plaintiff's claims. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case.") (citations, quotations, and brackets omitted).

also references certain internal "pre-production testing" and "analysis data" that were performed and collected, which, Plaintiff alleges, provided Defendants with first-hand knowledge of the Powertrain Defect. *Id*. at ¶¶ 42, 45. Despite their knowledge, however, Plaintiff claims that Defendants "concealed the existence of the Powertrain Defect to increase profits . . . and transfer[] the cost of the repair of the Powertrain Defect . . . to owners and lessors of the Class Vehicles . . . ." *Id*. at ¶¶ 1,6, 11.

On September 6, 2018, Plaintiff filed the instant putative class action on behalf of a nationwide class of consumers, and two subclasses of New Jersey and California consumers, who purchased, leased, own or owned a 2017-2018 Hyundai Santa Fe model vehicle. The original complaint against Defendants alleged a federal claim under the Magnuson-Moss Warranty Act ("MMWA"), as well as various New Jersey and California state law claims, including: fraud, negligent misrepresentation, breach of the express and implied warranties, unjust enrichment, and violations of the New Jersey Consumer Fraud Act ("NJCFA"), California's Consumer Legal Remedies Act ("CLRA"), and California's Unfair Competition Law ("UCL"). On December 14, 2018, Defendants moved to dismiss Plaintiff's original complaint.

In the July 29, 2019 Opinion and Order, I found that Plaintiff lacked standing to assert claims regarding the 2017-2018 Santa Fe Sport 2.0T and Santa Fe Sport 3.3L model vehicles, which Plaintiff did not lease. In addition, the Court dismissed Plaintiff's California state law claims and struck the California sub-class of consumers from the original complaint. Plaintiff's New Jersey state law claims were also dismissed, with the exception of the claims for breach of the express and implied warranties; however, Plaintiff was granted leave to amend the NJCFA and negligent misrepresentation claims. The parties were also directed to submit supplemental

briefing on whether New Jersey or California law has the most significant relationship to the nationwide class claims, *vis-a-vis* a choice of law analysis pursuant to the factors of the relevant Restatement section.

On August 16, 2019, Plaintiff filed the FAC, wherein he includes CLRA and UCL claims, and realleges his NJCFA and negligent misrepresentation causes of action. On August 12, 2019, Plaintiff moved for reconsideration of the prior July 29, 2019 Opinion and Order. In that motion, Plaintiff requests leave to amend with regard to his standing to represent the owners and lessees of the models of Santa Fe vehicles other than the ones he leased, the class definition, and his claim under the MMWA. On August 30, 2019, Defendants, once again, moved to dismiss Plaintiff's claims and strike certain allegations contained in the FAC. And, in accordance with the Court's instructions, the parties have submitted supplemental briefing on the choice of law issue, as Plaintiff contends that California law is applicable here, whereas Defendants, instead, argue that New Jersey law governs the claims of the nationwide class. I first turn to the issue of choice of law, which the Court raised in the previous Opinion, prior to adjudicating the dismissal and reconsideration motions.

## II.     DISCUSSION

### A.     STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted). Under such a standard, the factual

allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief.") (citations and internal quotations omitted).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citation, quotations, and bracketsomitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. (citations and quotations omitted). Lastly, "when there are well-pleaded factual allegations, the

court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (citations, quotations and brackets omitted); *Robinson v. Family Dollar, Inc.*, 679 Fed. Appx. 126, 132 (3d Cir. 2017).

### B.     CHOICE OF LAW

In the prior Opinion, the Court deferred on ruling on whether Plaintiff, a New Jersey resident, could assert consumer protection laws under California law, on behalf of a nationwide class of consumers. Indeed, because the parties did not address this specific issue, the Court directed them to provide additional briefing on which state law, that is, New Jersey or California, governs the claims of the nationwide class. *Schechter*, 2019 U.S. Dist. LEXIS 126021, at *8-11. In their supplemental submissions, Plaintiff, among other arguments, contends that California has the greatest interest in having its law applied, whereas Defendants, on the other hand, argue that an application of New Jersey law is required, on the basis of the pertinent Restatement factors. Having considered the parties' submissions regarding choice of law, the Court now turns to that question.

As a federal court sitting in diversity, I apply the choice-of-law rules of New Jersey to determine the controlling law. *Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313 U.S. 487, 496 (1941); *see also Thabault v. Chait*, 541 F.3d 512, 535 (3d Cir. 2008). New Jersey has adopted the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 155 (2008). In application, "the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to discern whether 'there is a distinction' between them." *Id.* at 144 (quoting *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir.2006) (additional citation omitted)). "If there is not an actual conflict, the inquiry is over." *Lebegern*, 471 F.3d at 428 (citations omitted). If,

however, an actual conflict is found to exist, the inquiry proceeds to the second step, pursuant to which "the court must determine which jurisdiction has the 'most significant relationship' to the claim." *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 207 (3d Cir. 2013) (quoting *Camp Jaycee*, 197 N.J. at 144)); *see also Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 180 (3d Cir. 2014) (citation omitted).

Turning to the first prong of the analysis, rather than argue that a conflict does not exist, Plaintiff, here, contends that Defendants have not demonstrated a material difference between the consumer protection laws of California and New Jersey. Pl.'s Supplemental Brief, at 3. However, in considering the applicable provisions of these statutes, time and time again, "courts in this District have recognized that the NJCFA materially conflicts with the consumer protection statutes of California, the CLRA and UCL." *Gray v. BMW N. Am., LLC*, 22 F. Supp. 3d 373, 380 (D.N.J. 2014) (citing *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011)); *see e.g.*, *Shapiro v. Logitech, Inc.*, No. 17-0673, 2019 U.S. Dist. LEXIS 15138, *19 (D.N.J. Jan. 31, 2019); *Butera v. Honeywell Int'l, Inc.*, No. 18-13417, 2019 U.S. Dist. LEXIS 67504, *7-8 (D.N.J. Apr. 18, 2019); *In re Bayer Phillips Colon Health Probiotic Sales Practices Litig.*, No. 11-3017, 2014 U.S. Dist. LEXIS 158233, at *11 n.3 (D.N.J. Nov. 6, 2014); *Majdipour v. Jaguar Land Rover N. Am., LLC*, No. 12-07849, 2013 U.S. Dist. LEXIS 146209, at *18-20 (D.N.J. Oct. 9, 2013); *Feldman v. Mercedes-Benz United States, LLC*, No. 11-00984, 2012 U.S. Dist. LEXIS 178924, at *14 (D.N.J. Dec. 18, 2012); *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 461 (D.N.J. 2009).

Indeed, the NJCFA requires Plaintiff to prove three elements: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Majdipour*, 2013 U.S. Dist. LEXIS 146209, at *19 (quoting

*Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009)). "'In place of the traditional reliance element of fraud and misrepresentation," the [NJCFA] "require[s] that plaintiffs demonstrate that they have sustained an ascertainable loss.'" *Id.* (quoting *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 391 (2007)). In contrast, both the UCL and CLRA require a showing of "actual reliance to satisfy the standing requirement of section 17204 [of the UCL]," and "actual reliance must be established for an award of damages under the CLRA." *Majdipour*, 2013 U.S. Dist. LEXIS 146209, at *19 (internal quotations and citations omitted); *see also In re Tobacco II Cases,* 46 Cal. 4th 298, 93 Cal. Rptr. 3d 559, 207 P.3d 20, 40 (Cal. 2009); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 101 Cal. Rptr. 3d 37, 47-48 (Cal. Ct. App. 2009). Thus, because these statutes differ in "substance," I proceed to the second prong of the analysis. *See Majdipour*, 2013 U.S. Dist. LEXIS 146209, at *20 (citing *Camp Jaycee*, 197 N.J. at 143).

Under the second step of the analysis, this Court must determine which state has the "most significant relationship" to the claim at issue by weighing the factors set forth in the Restatement section that corresponds to Plaintiff's causes of action. *See, e.g.*, *Nafar v. Hollywood Tanning Sys.*, 339 Fed. Appx. 216, 220 (3d Cir. 2009) (citing *Agostino*, 256 F.R.D. at 463 (D.N.J. 2009); *Camp Jaycee*, 197 N.J. at 143-44. Here, because Plaintiff asserts claims sounding in fraud and misrepresentation, the conflict of laws analysis under Section 148 must be applied. Restatement (Second) of Conflict of Laws § 148 (1971); *see also, e.g.*, *Agostino*, 256 F.R.D. at 462; *Nafar*, 339 Fed. Appx. at 221. And, based on Plaintiff's allegations in the FAC, the purported misrepresentations were not made and received in the same state, and therefore, the proper choice of law analysis involves § 148(2) of the Restatement, which comprises the following six factors:

> (a) the place, or places, where the plaintiff acted in reliance upon
> the defendant's representations, (b) the place where the plaintiff
> received the representations, (c) the place where the defendant
> made the representations, (d) the domicile, residence, nationality,
> place of incorporation and place of business of the parties, (e) the
> place where a tangible thing which is the subject of the transaction
> between the parties was situated at the time, and (f) the place
> where the plaintiff is to render performance under a contract which
> he has been induced to enter by the false representations of the
> defendant.

*Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 181 (3d Cir. 2014) (quoting Restatement (Second) of Conflict of Laws § 148(2)). In addition, the factors enumerated in § 148(2) of the Restatement "are to be construed in light of the principles set forth in § 6 of the Restatement, which include (l) the interests of interstate comity, (2) the interests of the parties, (3) the interests underlying the field of tort law, (4) the interests of judicial administration, and (5) the competing interests of the states." *Id*. at 182 (internal citation omitted).

Quoting general principles of law from an unpublished line of cases in this District, Plaintiff, as a threshold matter, argues that a "ruling on the choice of law issue[,]" before the exchange of discovery and the class certification stage of litigation, is premature. Pl.'s Supplemental Brief, at 1, 9-11. In particular, Plaintiff cites to *Chernus v. Logitech, Inc.*, a prior decision which I wrote, for the proposition that "[i]t is well-recognized that courts cannot meaningfully engage in a choice-of-law analysis absent a factual record; to do so would be entirely speculative." 2018 U.S. Dist. Lexis 70784, *23 n. 6 (D.N.J. Apr. 27, 2018) (citations omitted). However, in that case, I held that "[w]ithout the benefit of a factual record, *or* arguments from the parties regarding each and every factor set forth by the Restatement, I am not prepared to make any findings as to which state law applies in this case[.]" *Id*. at 29 (emphasis added). But unlike *Chernus*, where the parties did not brief the choice of law issue, on this motion, I have the benefit of the parties' arguments as to which state, *i.e.*, California or New

Jersey, has the most significant relationship to the case at hand. Having considered their respective positions, I find that further factual development is not required.

Here, Plaintiff does not make any specific arguments with respect to the Restatement factors, with the exception of the third factor, *i.e.*, "the place where the defendant made the representations."[2] More specifically, as to the third factor, Plaintiff contends that the Court cannot ascertain the location from which Defendants decided to refrain from disclosing the Powertrain Defect, as HMC is based in South Korea and HMA is based in California. Indeed, according to Plaintiff, the decision could have emanated from either location, therefore requiring a further developed record to adjudicate this question. Pl.'s Supplemental Brief, at 6. However, in raising this argument, Plaintiff overlooks that his own pleadings do not distinguish between HMA and HMC's alleged misconduct, as he claims that "the acts and/or omissions of each Defendant . . . were made known to, and ratified by, each of the other Defendants." FAC, ¶ 34. As such, the Plaintiff's allegations, which the Court must accept as true, support the inference that the alleged misconduct occurred in both California and South Korea. Nonetheless, because the remaining factors of the Restatement, which, for the reasons described below, all weigh in favor of New Jersey, choice of law can be resolved without a further developed record, regardless of whether the alleged misconduct all emanated from one location.

Indeed, the Third Circuit, and federal courts in this district, often adjudicate choice of law questions at the motion to dismiss stage within the context of class action consumer fraud disputes, such as the one here. *See, e.g.*, *Gray*, 22 F. Supp. 3d at 380 ("Although full factual development is often necessary in order to properly weigh the Restatement factors, the Third

---

[2]     Indeed, Plaintiff did not raise any argument as to the factors because, in his view, the record is devoid of the facts required for the Court to resolve the choice of law issues. I disagree. *See infra*.  Nonetheless, Plaintiff had the chance to raise a legal argument with respect to choice of law and he chose not to do so.

Circuit frequently determines choice of law questions at the motion to dismiss phase.") (citations omitted); *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 255 n. 5 (3d Cir. 2010) ("We reject [plaintiff's] argument that the District Court erred in resolving the choice-of-law determination as to his statutory consumer fraud act claim at the motion to dismiss stage, rather than wait until the class certification stage"); *Majdipour*, 2013 U.S. Dist. LEXIS 146209, at *17-18 (D.N.J. Oct. 19, 2013) (conducting a "choice of law analysis" notwithstanding "this early stage of litigation[.]"); *Feldman*, 2012 U.S. Dist. LEXIS 178924, at *13 ("[C]ourts, including the Third Circuit, frequently determine that choice of law analysis in a putative class action can be done at the motion to dismiss stage.") (citations omitted); *Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*, No. 08-5380, 2010 U.S. Dist. LEXIS 34584, at *6 (D.N.J. Apr. 8, 2010) ("[Plaintiff] again argues that it is premature to address choice of law issues at th[e dismissal] stage of the litigation. This argument was expressly rejected in this Court's prior Opinion and will not be reconsidered here."). Thus, having found that the Court can examine whether New Jersey or California has the most significant relationship to this action at this stage, I turn to the application of the factors of the Restatement.

The first, second, and fifth factors, that is, the place where Plaintiff acted in reliance upon Defendants' representations, the place where Plaintiff received the representations, and the place where the subject of the disputed transaction is located, all favor New Jersey. Based upon the allegations in the FAC, Plaintiff resides in New Jersey, where he leased his vehicle from an authorized dealership and interacted with local salespersons, "reviewed" and "received" advertisements from Defendants, and "suffered and will continue to suffer actual damages." FAC, ¶¶ 17, 20, 125, 140. Moreover, the fourth factor, regarding the domicile, residence, nationality, place of incorporation and place of business of the parties, also weighs in favor of

New Jersey. Indeed, in "cases of pecuniary loss," such as the instant matter, the Third Circuit has guided that "'[t]he domicil[e], residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant' because 'financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship.'" *Maniscalco*, 709 F.3d at 208 (quoting Restatement (Second) of Conflict of Laws § 148 cmt. i.); *see also Block v. Jaguar Land Rover N. Am., LLC*, No. 15-5957, 2016 U.S. Dist. LEXIS 69085, at *4-5 (D.N.J. May 26, 2016); *Majdipour*, 2013 U.S. Dist. LEXIS 146209, at *26. And, the sixth factor, which applies within the context of contract disputes, is irrelevant to this action "since there is no contract performance required by Plaintiff." *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 448 (D.N.J. 2012);

Thus, the sole factor which supports an application of California law is the third factor, the place where Defendants made the representations. Indeed, the parties do not dispute that HMA is based in California and that it is, at least in part, responsible for the actionable omissions and misconduct alleged in the FAC. But, even so, the Third Circuit has made clear that "this single contact," with nothing more, is insufficient to warrant an application of California law. *See Maniscalco*, 709 F.3d at 208. In *Maniscalco*, the named plaintiff, a South Carolina resident, brought a putative a class action against a corporate defendant for failing to disclose an alleged product defect in violation of the NJCFA. However, in considering the applicable Restatement factors, the Third Circuit determined that the plaintiff's home state, as opposed to the state of the corporate defendant's headquarters, bore the most significant relationship to the litigation. The Third Circuit explained that "[n]othing else about the relationship between the parties, other than the fortuitous location of [the defendants] headquarters, took place in the state of New Jersey. [Plaintiff's] home state, in which he received and relied on [the defendant's] alleged fraud, has

the 'most significant relationship' to his consumer fraud claim." *Id*. at 208-09. Therefore, in accordance with the Third Circuit's reasoning in *Maniscalco*, I find that the factors of the Restatement require an application of the law of Plaintiff's home state, New Jersey.[3]

Indeed, this holding is consistent with the decisions from this district that have applied the law of a plaintiff's home state in putative class actions, even when the alleged unlawful conduct emanated from a different state, where the corporate defendant was located or headquartered. *See Grandalski*, 767 F.3d at 180-82 (applying *Maniscalco* when the third factor of the Restatement was the sole factor that weighed in favor of the law of state where the defendant was headquartered); *see also Montich*, 849 F. Supp. 2d at 449 ("A majority of courts in this District have held that the mere fact that a company is headquartered [and] that [the] unlawful conduct emanated from [a state in which the plaintiff does not reside] will not supersede the numerous contacts with the consumer's home state for purposes of determining which state has the most significant relationship under Restatement § 148(2).") (internal quotation marks omitted); *Shapiro*, 2019 U.S. Dist. LEXIS 15138, at *25 ("[T]his single contact factor [factor three] cannot be of such significance that it outweighs the contacts in favor of applying" the law of the plaintiff's home state.); *Nikolin v. Samsung Elecs. Am., Inc.*, No. 10-1456, 2010 U.S. Dist. LEXIS 110942, at *14 (D.N.J. Oct. 18, 2010) ("[T]his Court is persuaded by the majority of courts that have held that the location of the manufacturer's headquarters does not supersede the numerous contacts with the consumer's home state."); *Feldman*, 2012 U.S. Dist. LEXIS 178924, at *17-18 ("In holding that the law of [the plaintiffs'] home state applies, this Court follows a long line of cases in this Circuit holding that a consumer's home state law

---

[3]     In conducting this choice of law analysis, I have taken the **principles set forth in § 6 of the Restatement** into consideration, and conclude that they do not alter the result that New Jersey law applies.

should apply," regardless of whether the defendant is headquartered elsewhere) (citations omitted).

Moreover, Plaintiff's reliance on *In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009), to support that California is "the state whose interest will be the most affected if its law is not applied" is misplaced. Pl.'s Supplemental Brief, at 7. There, the court found that New Jersey had the most significant connection to a putative class action that involved out-of-state plaintiffs, who brought NJCFA claims against a defendant for its alleged false statements and actionable omissions. *Id*. at 65. In so holding, the court, in that case, reasoned as follows: "[while] each of the states from which [the] class members will be drawn has an interest in assuring that its citizens will be compensated for any harm they may have suffered . . . [,] [o]nly New Jersey . . . possesses the additional interest in regulating a corporation headquartered within its borders." *Id*. at 68. As such, according to that court, the interests of the NJCFA in deterring local corporations from engaging in wrongful conduct would be compromised if another state's consumer protection laws were to govern that class action. *Id*. Although Plaintiff contends that, based on the concerns expressed in *Tele Aid*, an application of California's consumer protection law is required because that state has an overriding interest in regulating the conduct of its local businesses, the Third Circuit has rejected the reasoning in that decision:

> While, to be sure, New Jersey has an interest in deterring misconduct by corporations headquartered within its borders, it is far from clear that this interest would be sufficient to outweigh other significant contacts with a plaintiff's home state. New Jersey's deterrent interest might well be served by actions involving in-state plaintiffs or actions involving additional contacts within New Jersey without opening the floodgates to nation-wide consumer fraud class actions brought by out-of-state plaintiffs involving transactions with no connection to New Jersey other than the location of the defendant's headquarters.

*Maniscalco*, 709 F.3d at 210. Likewise, numerous federal courts in this district have also declined to follow the holding in *Tele Aid*. *See Montich*, 849 F. Supp. 2d at 449 (noting that the *Tele Aid* "decision has been criticized by other courts in this Circuit"); *Maloney v. Microsoft Corp.*, No. 09-2047, 2011 U.S. Dist. LEXIS 134841, at *28 (D.N.J. Nov. 21, 2011) ("This Court is similarly unsatisfied with the justifications provided in the *Mercedes Benz* decision."); *see also Shapiro*, 2019 U.S. Dist. LEXIS 15138, *26-27; *Feldman*, 2012 U.S. Dist. LEXIS 178924, at *13; *Majdipour*, 2013 U.S. Dist. LEXIS 146209, at *26-27; *Gray v. Bayer Corp.,* No. 08-4716, 2011 U.S. Dist. LEXIS 79498, at *22 (D.N.J. July 21, 2011); *Nikolin*, 2010 U.S. Dist. LEXIS 110942, at *14; *Agostino v. Quest Diagnostics, Inc.*, No. 04-4362, 2010 U.S. Dist. LEXIS 135310, at *28 (D.N.J. Dec. 22, 2010).

In addition, *Tele Aid* is factually distinguishable from the facts at hand, as the alleged misconduct, there, occurred in a single location, whereas the wrongful actions which form the basis of this lawsuit emanated from two separate places, including California and South Korea. Significantly, these circumstances, too, weigh against an application of the consumer protection laws of California. *Maniscalco*, 709 F.3d at 211 ("The Restatement instructs courts to discount the relative weight of the place where the defendant made the false representations when the alleged representations (or omissions or concealments in this case) are made in two or more states."); Restatement (Second) of Conflict of Laws § 148 cmt. h. ("The making of the representations provides a more important contact when the representations are made only in one state than when they are made in two or more."). Therefore, all factors considered, because Plaintiff's home state has the most significant relationship with this litigation, I find that that the laws of New Jersey, as opposed to California, are applicable here; as such, all of the nationwide

claims under California law, *i.e.*, the CLRA and UCL, are dismissed. I now address Plaintiff's New Jersey state law claims.

## C.    NJCFA

"It is well-established that NJCFA claims must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)." *Lieberson v. Johnson & Johnson Consumer Cos., Inc.*, 865 F. Supp. 2d 529, 538 (D.N.J. 2011) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007); *Arcand v. Brother Intern. Corp.*, 673 F.Supp.2d 282 (D.N.J. Nov. 30, 2009). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). That is, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200. However, within the context of omission-based claims, such as the one here, district courts should "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 307 (D.N.J. 2013) (quotations omitted).

To state a claim under the NJCFA, a plaintiff must allege the following three elements: "(1) unlawful conduct by [the] defendant, (2) an ascertainable loss by [the] plaintiff, and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009). Unlawful conduct "fall[s] into three general categories: affirmative acts, knowing omissions, and regulation violations." *Frederico*, 507 F.3d at 202. Relevant here, asserting an NJCFA claim on the basis of a material omission requires "the plaintiff [to] show that the defendant acted with knowledge, and intent is an essential element of the fraud." *Bosland*, 197 N.J. at 556. In contrast, "[o]ne who makes an affirmative

misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 605 (1997). Therefore, if a plaintiff does not allege that the defendant had knowledge of an alleged defect, the failure to inform the plaintiff of that defect is not actionable under the NJCFA.

This Court dismissed Plaintiff's initial NJCFA claim for failing to allege Defendants' unlawful conduct on the basis of a knowing omission. In the original complaint, to establish Defendants' alleged knowledge, Plaintiff referenced various TSBs and online consumer grievances that identified shifting and acceleration problems in the 2017 Santa Fe Sport 2.0T and Santa Fe 3.3L. However, those factual assertions, the Court found, were insufficient to show Defendants' knowledge of the Powertrain Defect as Plaintiff leased a different Santa Fe vehicle, *i.e.*, the Santa Fe Sport 2.4L, and he failed to allege that all three models, including his own, had similar powertrains components. *See Stevenson v. Mazda Motor of Am., Inc.*, No. 14-5250, 2015 U.S. Dist. LEXIS 70945, at *16 (D.N.J. June 2, 2015) ("Courts in this Circuit have found that, in order to show knowledge of a defect, consumers cannot rely on general allegations that a manufacturer had received complaints about similar makes and models of vehicles.").

### i. Knowledge

To establish Defendants' alleged knowledge of the Powertrain Defect in the FAC, Plaintiff again relies on (1) various online consumer complaints that were posted on the NHTSA website spanning from May 2016 to June 2019, (2) TSBs that Defendants issued on August 2016 and September 2016, concerning the 2017 Santa Fe 3.3L and the 2017 Santa Fe Sport 2.4L model vehicles, and, for the first time, Plaintiff (3) references a decision in *Reniger v. Hyundai Motor Am.,* a prior consumer class action suit between 2010-2012 Santa Fe owners/lessees and

Defendants. FAC, ¶¶ 39-53. Moreover, according to Plaintiff, the Court can infer Defendants' knowledge based on the factual assertions that concern models of vehicles other than the ones he leased, because the FAC contains allegations to support that all three Santa Fe models are comprised of identical components. FAC, ¶¶ 113-14. In determining whether these examples demonstrate Defendants' awareness of the Powertrain defect, I first address the prior class action suit that Plaintiff references in the FAC.[4]

Without providing a substantive discussion of the case, Plaintiff cites to the *Reniger* decision and alleges that Defendants were aware of the Powertrain Defect, "because a similar defect prompted a class action lawsuit covering earlier model Santa Fe vehicles suffering from the same defect." FAC, ¶ 45. Moreover, Plaintiff avers that, although a class settlement agreement was reached in that case, Defendants, nonetheless, "did nothing to correct the Powertrain Defect in later model Santa Fe vehicles," including his own 2017 Santa Fe Sport 2.4L. FAC, ¶ 45. However, Plaintiff's position is without merit, as the Court cannot infer Defendants' knowledge of the Powertrain Defect, on the basis of the *Reniger* decision for multiple reasons.

First, in contrast to Plaintiff's assertions, the alleged defect in *Reniger* and this action are not the "same." The *Reniger* decision involved a class of plaintiffs who owned or leased a 2010-

---

[4]     Although Plaintiff alleges knowledge based on "pre-production testing, pre-production design failure mode and analysis date, production design failure mode and analysis date, early consumer complaints made exclusively to Hyundai's network of dealers, testing conducted by Hyundai in response to consumer plaints, and repair order and parts date received by Hyundai," as I held in the prior Opinion, these general allegations fail to support that Defendants were aware of the Powertrain Defect before October 2016. *See*, *Granillo*, 2016 U.S. Dist. LEXIS 116573, at *29 (rejecting the plaintiffs' nearly identical allegations of "pre-release testing data, early consumer complaints to dealers, data from dealers, warranty claim data, customer complaints . . ., dealership repair orders, [and] testing conducted in response to owner or lessee complaints," as insufficient to show knowledge, because the plaintiffs failed to support them with any specific information.").

2012 Santa Fe, which suffered from a defect that caused the vehicles "to totally lose power (or 'stall')." *Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 891-92 (N.D. Cal. 2015). According to those plaintiffs, once the stalling defect occurred, "power steering and brakes are lost as well, creating a potentially dangerous situation in which it is difficult to control the vehicle." *Id*. at 892. Thus, the *Reniger* decision concerned a stalling problem that caused power steering and brake loss, whereas the claimed defect, in this action, results in a slowed or failed vehicle acceleration response. Nonetheless, even if the Court disregards these differences and presumes that a similar defect was involved in *Reniger*, Plaintiff's allegations would still fail to establish Defendants' knowledge.

Unlike *Reniger,* where the plaintiffs owned or leased a Santa Fe from 2010-2012, Plaintiff, here, seeks to represent a class of 2017-2018 Santa Fe Sport owners and lessees. Indeed, the *Reniger* decision and the instant action involve a different generation of Santa Fes, which makes and models are more than at least five years apart. Yet, Plaintiff does not allege that Defendants continued to manufacture these vehicles with the same components and parts, or that, notwithstanding the significant passage of time, the Santa Fes from 2010-2012 have not undergone a change in design. In the absence of these allegations, Plaintiff cannot claim, without engaging in pure speculation, that a vehicular defect in the 2010-2012 Santa Fe is still somehow present in his 2017 Santa Fe Sport 2.4L. Therefore, for these various reasons, the prior class action suit against Defendants does not establish their knowledge of the alleged Powertrain Defect.

As to the remaining examples which are alleged in the FAC, Plaintiff relies on 25 consumer grievances that various Santa Fe owners and lessees posted on the NHTSA website, spanning from April 1, 2016 to June 22, 2019. Although most, if not all, of these complaints

were considered and rejected in the previous Opinion, Plaintiff, for the reasons discussed below, contends that he has now alleged a proper basis to infer Defendants' knowledge of the claimed Powertrain Defect from these grievances. In addition, Plaintiff references two TSBs that Defendants issued on August 2016 and September of 2016, pertaining to the 2017 Santa Fe 3.3L and 2017 Santa Fe Sport 2.4L model vehicles. I will first address the online consumer complaints.

At the outset, I note that the FAC alleges that Defendants are aware of the posted complaints. Indeed, although Defendants emphasize that Plaintiff fails to assert that the "NHTSA informed Hyundai of the [online] complaints," his pleadings include the following allegations: "[c]ar manufacturers like Defendants know that the NHTSA is a repository for complaints, and as such can provide an early warning mechanism for responding to design or manufacturing defects that pose a safety hazard." FAC, ¶¶ 42, 51(a). Moreover, according to Plaintiff, Defendants track the NHTSA website as a matter of "online reputation management . . . [,] a standard business practice among most major companies" which "entails monitoring consumer forums, social media and other sources on the internet where consumers can review or comment on products." FAC, ¶ 51(b). This practice, Plaintiff asserts, allows Defendants to review "candid comments," which "provide valuable data regarding quality control issues and customer satisfaction." FAC, ¶ 51(b). Viewed as a whole, Plaintiff's factual allegations assert a plausible basis to conclude, at the dismissal stage, that Defendants reviewed or monitored the NHTSA website and were, therefore, aware of the posted online consumer complaints.[5] *See Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992) ("All allegations in the complaint must be accepted

---

[5]     I note that some of the grievances state that the problems described therein were reported to Defendants. FAC, ¶ 47. This further supports Defendants' alleged knowledge of the consumer complaints.

as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom.") (citation omitted).

However, despite Defendants' alleged awareness, more than half of the consumer complaints were lodged after October 2016, the date on which Plaintiff leased his vehicle. Although Plaintiff contends that these complaints "are still relevant to the existence of a defect," in the prior Opinion, the Court explained that he cannot depend on events which post-date his lease, to establish that Defendants were aware of the alleged defect during the applicable timeframe. *See, e.g., Granillo v. FCA US LLC*, No. 16-153, 2016 U.S. Dist. LEXIS 116573, at *29 (D.N.J. Aug. 29, 2016) (post-sale complaints cannot "support an inference that Defendant had the requisite knowledge as of" the date on which the purchases occurred); *Stevenson*, 2015 U.S. Dist. LEXIS 70945, at *19 ("[T]o the extent that [the plaintiff's] NJCFA claim relies on consumer complaints made to the NHTSA, these complaints were all made well after [the plaintiff] purchased his vehicle, and so they cannot show that Mazda was aware of the defect at that time."); *Oliver v. Funai Corp.*, No. 14-04532, 2015 U.S. Dist. LEXIS 169998, at *10 (D.N.J. Dec. 21, 2015) (post-sale consumer complaints do not support allegations of pre-sale knowledge). Therefore, because the FAC identifies no more than thirteen online consumer complaints and two issued TSBs that pre-date the lease of Plaintiff's vehicle, the Court considers nothing else in determining whether Defendants had knowledge of the alleged Powertrain Defect.

The thirteen consumer complaints that predate Plaintiff's lease were posted on the NHTSA website from April 1, 2016 to July 15, 2016. These grievances, for the most part, describe "hesitation" and "stumbling" problems that occur when the driver attempts to accelerate from a slow speed or a stop. FAC, ¶ 47. In addition, the TSB from August 2016 is entitled "TCU

update – shift hesitation and shock improvement," and the description of that document states: "[t]his bulletin provides information related to the TCU software update for certain 2017 Santa Fe vehicles that may experience a transmission hesitation or shift shock when accelerating at slow speeds." Ershow Cert., ¶ 2, Exhibit 1. However, as the Court found in the prior Opinion, these examples, in and of themselves, are insufficient to establish Defendants' alleged knowledge of a defect in the Santa Fe Sport 2.4. Indeed, the online consumer complaints either pertain to a different vehicle than that leased by Plaintiff or an unspecified model. Moreover, the TSB from August 2016 applies to the 2017 Santa Fe 3.3L, instead of Plaintiff's Santa Fe Sport 2.4L. Therefore, Plaintiff cannot assert a viable NJCFA claim, unless he alleges that the problems associated with the vehicles, other than the one Plaintiff leased or similar vehicles, provided Defendants with sufficient notice or knowledge of the same problems in his Santa Fe Sport 2.4L.

To make this connection, Plaintiff includes one additional allegation in his amended pleading: "[t]he 2017 Hyundai Santa Fe and 2017 [Hyundai] Santa Fe Sport have identical, standard-issue traction-control systems. Hyundai's press release for the 2017 Santa Fe lineup states that each car in the lineup 'includes Vehicle Stability Management (VSM) with Electronic Stability Control (ESC) and Traction Control System . . . .'" FAC, ¶ 114. As such, according to Plaintiff, "notice of a defective traction-control unit in the 2017 Hyundai Santa Fe should have put Defendants on notice of an identical defect in the 2017 Santa Fe Sport." FAC, ¶ 114; Plaintiff's Opposition Brief, at 11 ("This common link among the vehicles . . . establishes the link as to why TSBs related to other 2017-2018 Hyundai Santa Fe models placed Defendants on notice of the Powertrain Defect in all models that contain these identical components."). I disagree.

Here, while Plaintiff has identified a component that is included in all of the Santa Fes, his limited factual allegations are insufficient to meet the heightened pleading standard under Rule 9(b). *See* Fed. R. Civ. P. 9(b) (requiring that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Indeed, the amended pleadings do not provide a factual description of, nor has Plaintiff, at a minimum, identified, the various parts and components that combine to form a powertrain. Without including these allegations in the FAC, the amended pleadings fail to establish how a shared "[v]ehicle [s]tability [m]anagement . . . with [e]lectronic [s]tability [c]ontrol and [t]raction [c]ontrol [s]ystem" (the "shared component"), as a unit, relate to or impact the powertrain mechanism of an automobile. But, even if the shared component, nonetheless, bears a sufficient relationship to the powertrain, Plaintiff still fails to allege Defendants' alleged knowledge of a defect in his particular Santa Fe model.

Indeed, the 2017-2018 Santa Fe Sport is offered in two different versions, including a turbocharged and a non-turbocharged model. The non-turbocharged version, which Plaintiff leased, is equipped with a 185 horsepower 2.4-liter engine, whereas the more powerful turbocharged model includes a 240 horsepower 2.0-liter engine. Ershow Cert., ¶¶ 4-5, Exhibits 3- 4. Moreover, the 2017-2018 Santa Fe SUV is the largest of the three vehicles, as it includes a third row of seating and a 290 horsepower 3.7-liter V-6 engine. *Id*. As such, to establish Defendants' knowledge from the examples that relate to a different Santa Fe model than that Plaintiff leased, Plaintiff must allege that the shared component functions or operates in an identical fashion, across all three vehicles notwithstanding that each is designed for a different purpose, with engines ranging in strength, size, and horsepower. However, these matters are not alleged in the FAC.

In addition, the pleadings do not reference a TSB that pertains to the shared component. As stated, the August 2016 TSB that Plaintiff relies on concerns the 2017 Santa Fe SUV 3.3L, a different model than that leased by Plaintiff; that document provides specific "information related to the *[transmission control unit]* software update for certain 2017 Santa Fe vehicles." Ershow Cert., ¶ 2, Exhibit 1 (emphasis added). However, the transmission control unit, in particular, is not identified as a shared component in the amended pleadings, which is instead alleged to include the "[v]ehicle [s]tability [m]anagement . . . with [e]lectronic [s]tability [c]ontrol and [t]raction [c]ontrol [s]ystem." FAC, ¶ 114. Moreover, while the transmission control unit and the shared component could, in fact, be one in the same, that fact is neither addressed nor explained in Plaintiff's pleadings or even in his brief. Indeed, in the absence of such allegations, the Court cannot infer that the plain language of the August 2016 TSB reveals a defect of a component that is included in Plaintiff's vehicle. Therefore, Plaintiff has not shown that a problem associated with a vehicle, other than that a model or similar model that Plaintiff leased, provided Defendants with knowledge of the same problem in his Santa Fe Sport 2.4L. I turn to the remaining example that Plaintiff relies on to establish knowledge of a defect.

In the FAC, Plaintiff quotes certain portion of the September 2016 TSB, the sole example that concerns his own vehicle, and alleges that the TSB "relates to the Powertrain Defect." FAC, ¶ 43. However, Plaintiff's sparse allegations with respect to the September 2016 TSB fail to establish Defendants' knowledge of the Powertrain Defect, considering the heightened pleading standard that applies to his claims. *See Fuqua v. Bristol-Myers Squibb Co.*, 926 F. Supp. 2d 538, 550 (D.N.J. Feb. 15, 2013) (noting that Rule 9(b) precludes a litigant from alleging "conclusory, generalized facts"); *In re Catanella & E.F. Hutton & Co., Sec. Litigation*, 583 F. Supp. 1388, 1397 (E.D. Pa. 1984) (stating that "Rule 9(b)'s particularity requirements prohibits reliance upon

unsubstantiated conclusory allegations."). Nonetheless, and more problematic, the relationship between the September 2016 TSB and the Powertrain Defect is not evident from the plain text of that document.[6]

For one, unlike the August 2016 TSB, which is titled "Shift Hesitation and Shock Improvement," the subject of the September 2016 TSB does not include a specific reference to the alleged problems that are associated with the Powertrain Defect. Instead, that document is labeled "Automatic Transmission Oil Pressure and Data Transfer," and it appears to relate, in large part, to a technical procedure that is required to transfer information between vehicle components that, for whatever reason, are replaced. FAC, ¶ 43. Exhibit A. Indeed, the plain text of the September 2016 TSB provides as follows: "[t]h[e] bulletin provide[s] 'a procedure to transfer pressure data to the [powertrain control module] using GDS Mobile. This procedure is necessary to reduce the [transmission control module] learning time and improve the shift quality.'" FAC, ¶ 43, Exhibit A. Moreover, while Plaintiff emphasizes that the words "shift quality" are contained in the September 2016 TSB, the language of that document, viewed as a whole, is in stark contrast to the description that is provided in the prior TSB issued in Augusts 2016. Indeed, that document makes an explicit reference to the 2017-2018 "Santa Fe vehicles" that are "experience[ing] transmission hesitation or shift shock when accelerating at slow speeds," the exact problem Plaintiff complains of in his vehicle. Ershow Cert., ¶ 2, Exhibit 1. No

---

[6]     Plaintiff cites to a California state court ruling in *Damico v. Hyundai Motor America*, No. 30-2018 (Cal. Super. Ct. July 27, 2018), a different putative class action lawsuit involving HMA. There, the court, among other things, referenced the September 2016 TSB and held that the plaintiff's pleadings, in that case, were sufficient to support a CLRA claim. However, *Damico* is a non-binding decision that applied California law, which is inapplicable here, and it was resolved within the context of a demurrer. Moreover, the plaintiff's allegations, there, were not examined under the heightened pleading standard of Rule 9(b). Therefore, Plaintiff's reliance on the *Damico* decision to establish Defendants' knowledge of the alleged Powertrain Defect is misplaced.

such language is included in the September 2016 TSB. Thus, I cannot find that the September 2016 TSB, on its face, relates to the Powertrain Defect.

In short, Plaintiff has not pled sufficient facts that Defendants were aware of the Powertrain Defect before the date on which he leased his vehicle, and therefore, he has not alleged unlawful conduct on the basis of a knowing omission, as defined under the NJCFA. Nonetheless, because Plaintiff is being granted leave to amend his NCFA claim to establish Defendants' alleged knowledge, the Court proceeds to address whether he has pled a sufficient ascertainable loss.

### ii. Ascertainable Loss

In the prior Opinion, the Court found that Plaintiff did not allege a quantifiable or measurable ascertainable loss. Indeed, although Plaintiff claimed that he would have leased a different vehicle if the alleged Powertrain Defect was disclosed, the Court explained that he failed to allege a comparable automobile or its price. Plaintiff now contends that the FAC pleads a measureable or quantifiable loss in accordance with the dictates of this Court, but Defendants, nonetheless, argue that his amended claim still fails to meet this requirement. According to Defendants, Plaintiff has not pled an ascertainable loss, because he has not identified an appropriate "comparable vehicle[]" in his amended pleadings. Defendants' Dismissal Motion, at 16-18.

Ascertainable loss is set forth in N.J.S.A. 56:8-19, which provision authorizes a statutory remedy for "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act." *D'Agostino v. Maldonado*, 216 N.J. 168, 184-85 (2013). "[T]he plain language of the Act unmistakably makes . . . ascertainable loss a prerequisite for a

private cause of action. An ascertainable loss under the NJCFA is one that is 'quantifiable or measurable,' not 'hypothetical or illusory.'" *Id*. at 185 (internal citations and quotations omitted); *see Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 558 (2009) (defining term "ascertainable loss" to "mean[] that plaintiff must suffer a definite, certain and measurable loss, rather than one that is merely theoretical") (citing *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 (2005)).

Moreover, there are three recognized theories of ascertainable loss that may apply to a NJCFA claim. *Mladenov v. Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d 360, 375 (D.N.J. 2015); *Hammer v. Vital Pharms., Inc.*, No. 11-4124, 2012 U.S. Dist. LEXIS 40632, at *22 (D.N.J. Mar. 26, 2012). Either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle. *Hammer*, 2012 U.S. Dist. LEXIS 40632, at *22-23. The "out-of-pocket" theory may include the purchase price of a misrepresented product if the purchasers did not receive a refund and the seller's misrepresentations rendered the product essentially worthless. *Id*. A "loss-in-value" theory is based on the quantifiable difference in value between the merchandise as [advertised] and the merchandise as delivered. *Id*. Under the third theory, an ascertainable loss can include a nominal overcharge for which the plaintiffs have not made a pre-suit demand for a refund. *Id*.

Significantly, it is axiomatic that the pleadings need not "demonstrate the ascertainable loss 'in all its particularity.'" *In re Mercedes-Benz Emissions Litig.*, No. 16-881, 2019 U.S. Dist. LEXIS 16381, at *76 (D.N.J. Feb 1., 2019) (quoting *Thiedemann*, 183 N.J. at 248). Instead, the requirement to allege an ascertainable loss is met if the pleadings set "'the stage for establishing the measure of damages.'" *Id*. (quoting *Thiedemann*, 183 N.J. at 248). Indeed, "[t]he precise amount of loss need not be known; it need only be measureable." *Dzielak v. Whirlpool Corp.*, 26

F. Supp. 3d 304, 336 (D.N.J. 2014) (citing *Talalai v. Cooper Tire & Rubber Co.*, 360 N.J. Super. 547, 563 (Ch. Div. 2001)); *see also Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, 08-1057, 2008 U.S. Dist. LEXIS 105413, at *7 n. 3 (D.N.J. Dec. 17, 2008) ("Although there is no specific dollar amount alleged in Plaintiff's Complaint, that level of specificity is not required by the case law and Rule 9(b).").

Here, to establish an ascertainable loss, Plaintiff alleges that the Santa Fe Sport is a compact SUV that has a significant amount of "competitors in the market place from various other manufacturers." FAC, ¶ 121. As examples, Plaintiff identifies the following vehicles in his amended complaint: (1) 2017 Chevrolet Equinox ($23,100.00 MSRP); (2) 2017 Ford Escape ($23,750.00 MSRP); (3) 2017 Honda CR-V ($24,045.00 MSRP); and (4) 2017 Nissan Rogue ($23,820.00 MSRP). FAC, ¶ 123. Moreover, Plaintiff contends that, if he was informed about the alleged Powertrain Defect, he would have instead leased one of the comparable vehicles identified above, all of which constitute compact SUVs and are less expensive than the 2017 Santa Fe Sport 2.4L that he leased at a price of $28,560.00.[7] FCA, ¶ 121. Thus, based on these allegations, Plaintiff identifies the price at which he leased his vehicle, and provides the prices of other, less expensive compact SUVs that he could have instead leased. The difference between those two figures, although not enumerated, suffices to allege an ascertainable loss. *See Dzielak*, 26 F. Supp. 3d at 335-36 (finding that the plaintiff pled an ascertainable loss, because the

---

[7]     Defendants also contend that Plaintiff fails to plead an ascertainable loss, because he compares the MSRP as reflected on the window sticker of his Santa Fe, which includes "whatever options and features he desired[,]" to the "starting MSRPS" of the other identified vehicles in the FAC. While I find Defendants' contentions unpersuasive for the reasons provided the I also, nonetheless, note that Plaintiff's opposition brief provides a link to a website which reveals that his vehicle's base MSRP is still higher than the base MSRPs for the other comparable vehicles. *See Estate of Patterson v. City of Pittsburgh*, No. 11-1021, 2011 U.S. Dist. LEXIS 118344, at *3 n.2 (W.D. Pa. Oct. 13, 2011) (considering a webpage on a motion to dismiss as a matter of "public record") (citing *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007)).

amended complaint "alleges facts that would allow the Court to quantify a difference in value and even suggests a means to calculate loss[.]"); *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 102-03 (D.N.J. 2011) (in pleading an ascertainable loss, "the valuations do not have to be perfect. They need only provide a reasonable basis for valuation that is not speculative or unquantified.") (citations omitted).

Nonetheless, Defendants contend that Plaintiff has not pled an ascertainable loss, despite including four comparable vehicles in the amended complaint, because he does not describe what makes those vehicles "comparable," nor does he provide a reason for leasing his Santa Fe in the first place, "if these other vehicles[,]" in fact, "ha[ve] lower prices for the same thing[.]" Defendants' Dismissal Motion, at 17. However, Defendants' arguments fail to otherwise persuade the Court.

First, in contrast to Defendants' contentions, Plaintiff's subjective decision-making process in selecting a Santa Fe Sport 2.4L over the other comparable vehicles need not be alleged in the FAC. Indeed, establishing an ascertainable loss through the identification a comparable product "does not require the plaintiff to plead that he or she would actually have purchased the product used as the basis for comparison." *Smajlaj*, 782 F. Supp. 2d at 102. Rather, a litigant, like Plaintiff has done here, is entitled to use a comparable product for the simple purpose of "valuing" an alleged economic harm, or demonstrating that his or her alleged injuries are, in fact, quantifiable or measurable. *Id.; In re Gerber Probiotic Sales Practices Litig.*, No. 12-835, 2014 U.S. Dist. LEXIS 145437, at *21 (D.N.J. Oct. 6, 2014) (granting leave to amend and directing the plaintiff to "insert the identities and prices of comparable products sufficient to allege ascertainable loss," as is required under the NJCFA).

Second, the FAC contains examples of appropriate "comparable vehicles." FAC, ¶ 122. As Plaintiff has alleged, the comparable vehicles include the Chevrolet Equinox, Ford Escape, Honda CR-V, and Nissan Rogue, all of which, like his Santa Fe Sport, are marketed as a "compact SUV." FAC ¶¶ 121-23. But, without disputing the classification of these automobiles, Defendants contend that Plaintiff is required to allege a comparable vehicle, equipped with the exact features and accessories that were included in his own Santa Fe, otherwise an accurate "price comparison" cannot be performed. Defendants' Reply Brief, at 10-11. However, the strict approach and the degree of precision that Defendants advocate for on this motion conflicts with the applicable standard for pleading an ascertainable loss, pursuant to which a litigant is required to allege no more than enough "information" so as to provide "the defendant [with] notice of possible damages." *Mladenov v. Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d 360, 374-75 (D.N.J. 2015) (quoting *Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, 2008 U.S. Dist. LEXIS 105413, at *7 n. 3 (D.N.J. Dec. 9, 2008)).

This much, Plaintiff has done, as he identifies four other compact SUVs and their corresponding prices, which are all lower than the price at which he leased his Santa Fe Sport. To the extent that the alleged base prices of these automobiles require an upward adjustment to account for a potential difference between the comparator vehicles and Plaintiff's Santa Fe Sport, these modifications can be made at a later stage of litigation. For now, because Plaintiff has demonstrated that his ascertainable loss is quantifiable or measurable, his pleadings are sufficient. *See Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 446 (D.N.J. 2012) ("The plaintiff need not, however, plead ascertainable loss with pinpoint specificity.") (citations omitted); *see also* Restatement (Second) of Contracts § 352 cmt. a (1981) (explaining that

"[d]amages need not be calculable with mathematical accuracy and are often at best approximate.").

## D.   NEGLIGENT MISREPRESENTATION

In Count One of the FAC, Plaintiff asserts a claim for negligent misrepresentation on the basis of Defendants' alleged failure to disclose the Powertrain Defect "and its corresponding safety risk" at the time of sale or lease.[8] FAC, ¶ 74. In seeking dismissal, Defendants argue that it was under no obligation to disclose this information, because the factual allegations contained in the FAC fail to establish that the parties share a "special relationship." Defendants' Dismissal Motion, at 18-19.

Pursuant to the law in New Jersey, "'[a] cause of action for negligent misrepresentation may exist when a party negligently provides false information.'" *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 529 (D.N.J. 2008) (quoting *Karu v. Feldman*, 119 N.J. 135, 146 (N.J. 1990)); *see also Peruto v. TimberTech Ltd*, 126 F. Supp. 3d 447, 450 (D.N.J. 2015); *Singer v. Beach Trading Co.*, 379 N.J. Super. 63, 73 (App. Div. 2005). To allege a successful claim for negligent misrepresentation, a plaintiff must assert factual allegations pleading three elements: "[1] the defendant negligently made an incorrect statement of a past or existing fact, [2] that the plaintiff justifiably relied on it and [3] that his reliance caused a loss or injury." *Masone v. Levine*, 382 N.J. Super. 181, 187 (App. Div. 2005) (citing *H. Rosenblum, Inc.*

---

[8]     Although Plaintiff contends that his negligent misrepresentation claim is not subject to the strictures of Rule 9(b), the Third Circuit has explained that, "[e]ven when 'fraud is not a necessary element of a claim[,] . . . claims that do sound in fraud must be pled with particularity.'" *Travelers Indem. Co. v. Cephalon, Inc.*, 620 Fed. Appx. 82, 85 n. 3 (3d Cir. 2015) (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 (3d Cir. 1996)). In that connection, Plaintiff's causes of action for fraud and negligent misrepresentation are based on the same alleged misconduct in the FAC. Nonetheless, I need not determine whether this factual overlap triggers an application of Rule 9(b), because, even under the liberal pleading standard of Rule 8(a), Plaintiff fails to state a cognizable negligent misrepresentation claim for the reasons explained *infra*.

*v. Adler*, 93 N.J. 324, 334 (1983)); *see also Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 440 (D.N.J. 1998).

Negligent misrepresentation claims arising from a "breach of omission" instead of an affirmative misrepresentation require a plaintiff to allege that the defendant possessed a duty to disclose. *S. Broward Hosp. Dist. v. MedQuist, Inc.*, 516 F. Supp. 2d 370, 397 (D.N.J. 2007) (citation omitted); *see also Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 U.S. Dist. LEXIS 32584, at *36 (D.N.J. Mar. 31, 2010) ("While an act of omission may constitute a viable negligent misrepresentation claim, a plaintiff may not bring such a claim unless the breaching party owes an independent duty imposed by law.") (citation and quotations omitted); *In re Zenith Labs. Secs. Litig.*, No. 86-3241, 1993 U.S. Dist. LEXIS 18478, at *36 (D.N.J. Feb. 11, 1993) ("In addition, silence may substitute for affirmative misrepresentations if the defendant is under a duty to disclose.") (citing *Karu*, 119 N.J. at 148). A manufacturer's "duty to disclose" an alleged defect is created when a "special relationship" between the plaintiff and defendant exists. *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 604 (D.N.J. 2016) (citing *S. Broward Hosp. Dist.*, 516 F. Supp. 2d at 397).

In New Jersey, three kinds of limited relationships give rise to a duty to disclose, including: "(1) where a fiduciary relationship exists between the parties, (2) where the transaction itself calls for perfect good faith and full disclosure, or (3) where one party expressly reposes a trust and confidence in the other." *Maertin v. Armstrong World Indus.*, 241 F. Supp. 2d 434, 461 (D.N.J. 2002) (internal quotations and citations omitted); *see also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993); *Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 U.S. Dist. LEXIS 32584, at *36 (D.N.J. Mar, 31, 2010) (citation omitted); *New Jersey Economic Development Authority v. Pavonia Restaurant, Inc.*, 319 N.J. Super. 435, 446 (App.

Div. 1998) (citation omitted). In the absence of such allegations, "[c]ourts in this district have not hesitated to dismiss negligent misrepresentation claims by a purchaser against a manufacturer." *Argabright*, 201 F. Supp. 3d at 604.

In addition, a plaintiff can assert an omission-based negligent misrepresentation claim in connection with a concealed defect "when a [manufacturer] has made a partial disclosure." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 U.S. Dist. LEXIS 70299, at *62 (D.N.J. May 8, 2017) ("New Jersey imposes a duty to disclose when a defendant has made a partial disclosure.") (citation omitted); *Amato v. Subaru of Am., Inc.*, No. 18-16118, 2019 U.S. Dist. LEXIS 209659, at *63 (D.N.J. Dec. 5, 2019) ("'[S]pecific ambiguous partial disclosures or statements by [manufacturers]' may impose [a] duty [of disclosure.]") (citations omitted); *see also Ponzio v. Mercedes-Benz USA, LLC*, No. 18-12544, 2020 U.S. Dist. LEXIS 43287, at *67 (D.N.J. Mar. 11, 2020) (citations omitted). Indeed, in situations involving partial disclosures, a manufacturer cannot remain silent, but must instead disclose the information that is required to "make a previous [misleading] statement true." *Lightning Lube, Inc.*, 4 F.3d at 1185; *see also In re Volkswagen Timing Chain*, 2017 U.S. Dist. LEXIS 70299, at *62-63; *Amato*, 2019 U.S. Dist. LEXIS 209659, at *63.

Here, Plaintiff has not established that he shared a special relationship with Defendants. For instance, the FAC fails to allege that Plaintiff reposed a particular "trust and confidence" in Defendants,[9] prior to the lease of his vehicle. *See Stevenson v. Mazda Motor of Am., Inc.*, No. 14-

---

[9] Plaintiff alleges, in threadbare fashion, that, "[w]hen Plaintiff leased his vehicle . . . , he depended and relied on Defendants' skill and knowledge." FAC, ¶ 75. However, the FAC includes no factual assertions in support of his alleged reliance, nor does he provide a single example of the conduct or actions that induced him to depend on Defendants when he leased his Santa Fe Sport. Thus, while the Court need not accept unsubstantiated allegations, I, nevertheless, find that "[t]he mere fact that Plaintiff trusted and relied on [Defendants] is insufficient to show a special relationship requiring a duty to disclose." *Argabright*, 201 F. Supp.

5250, 2015 U.S. Dist. LEXIS 70945, at *26 (D.N.J. June 2, 2015) (no disclosure obligation where "there [were] no allegations to suggest that [defendant car manufacturer] did anything that would have encouraged [the plaintiff] to place particular trust or confidence in it[.]"). Moreover, the pleadings do not describe a "fiduciary relationship" or an intrinsically fiduciary transaction that required Defendants to disclose the alleged Powertrain Defect. And, more importantly, Plaintiff cannot establish that such a relationship or transaction resulted from a normal, arms-length transaction between himself and an authorized car dealership. Indeed, on numerous occasions, New Jersey courts have found "no special relationship between individual consumers and automobile manufacturers that would impose a duty to disclose on the manufacturers." *Coba v. Ford Motor Co.*, No. 12-1622, 2013 U.S. Dist. LEXIS 8366, at *37 (D.N.J. Jan 22, 2013); *Green v. GMC*, A-2831, 2003 N.J. Super. Unpub. LEXIS 13, at *25 (App Div. July 10, 2003) ("[W]e find no affirmative duty to disclose information . . . , since no fiduciary or implied fiduciary relationship existed between plaintiffs and the manufacturers of their cars . . . ."); *see also Argabright*, 201 F. Supp. 3d at 578; *Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 U.S. Dist. LEXIS 32584, at *37-38 (D.N.J. Mar. 31, 2010); *Ponzio*, 2020 U.S. Dist. LEXIS 43287, at *67.

In addition, Plaintiff has not alleged a partial disclosure that triggered Defendants' obligation to disclose additional information. As the Court explained in the previous Opinion, the instant action arises not from Defendants' affirmative misrepresentations or misleading statements, but from their alleged material omissions of fact with respect to the Class Vehicles. Indeed, the FAC contains no partial disclosures that require further explanation on the part of

---

3d at 603 (internal quotations and citation omitted); *see also Stevenson*, 2015 U.S. Dist. LEXIS 70945, at *29-30 ("Plaintiff argues that Mazda had a duty to disclose, because [Plaintiff] trusted and relied on Mazda. However, the mere fact of that trust is insufficient to show a special relationship requiring a duty to disclose.") (internal quotations and citation omitted).

Defendants. Rather, in his pleadings, Plaintiff references various unspecified "negligent misrepresentations," without alleging a particular misleading statement that could require Defendants to disclose the alleged Powertrain Defect. *See Stevenson*, 2015 U.S. Dist. LEXIS 70945, at *29-30 (D.N.J. June 2, 2015) (no obligation to disclosure when the plaintiff failed to allege that the defendant car manufacturer made a misleading partial disclosure). Thus, in the absence of a special relationship or a partial disclosure that required further information to prevent a misleading impression, Plaintiff's omission-based negligent misrepresentation claim fails.

Moreover, Plaintiff's reliance on *Highlands Ins. Co. v. Hobbs Group, LLC*, 373 F. 3d 347 (3d Cir. 2014), wherein the Third Circuit held that a negligent misrepresentation claim need not arise from a special relationship, is misplaced. There, Olympic procured commercial automobile coverage from Highlands through its insurance broker. *Id.* at 349. A provision in the contract required Olympic to obtain a performance bond, guaranteeing its $2.5 million dollar deductible. *Id.* at 350. Hobbs assisted in the bond procurement process, during which it worked and remained in constant communication with Highlands, but Hobbs failed to disclose that the bond was never obtained. *Id.* at 353. Thereafter, for various reasons, Highlands terminated the parties' contract, prior to which it processed over $3 million dollars in claims against Olympic. *Id.* at 349. But, the deductible on those claims was never paid, and because a performance bond was not secured, Highlands was unable to recover the amount owed. *Id.* As a result, Highlands filed a negligence action against Hobbs, on the basis of its failure to disclose that a bond was never issued.

Although Highlands' claims arose within the context of procuring a performance bond instead of an insurance plan, the Third Circuit noted the inherent similarities between both

instruments. *Id*. at 352. The Third Circuit then examined Highlands' claims pursuant to a basic tenet of insurance law, requiring brokers to use "reasonable skill and diligence" in performing services that impact non-contractual parties within "the zone of harm emanating from its activities." *Id*. at 351-52. Pursuant to that standard, the Third Circuit reasoned that Highlands fell within Hobbs' zone of harm, based on their "close working relationship" and "the nature and volume of the communications" exchanged between them during the bond procurement process. *Id*. at 353. As such, according to the Third Circuit, Hobbs was required to inform Highlands about Olympic's failure to secure a performance bond as a matter of "good faith and common decency." *Id*. at 355.

While Plaintiff argues that notions of "good faith and common decency" are, too, applicable in the instant matter, the circumstances of this case are in stark contrast to situation presented in *Highlands*. In particular, unlike the causes of action asserted in *Highlands*, Plaintiff's claims arise not from a "close working relationship" that resulted in a continuous line of communication with Defendants, but from a routine, arms-length business transaction between a consumer and a manufacturer's authorized dealership. *See Peerless Wall & Window Coverings, Inc. v. Synchronics*, *Inc.*, 85 F. Supp. 2d 519, 532 (W.D. Pa. 2000) ("[I]n a typical arms-length business relationship . . . there is no duty to disclose.") (citations omitted). Indeed, because the pleadings demonstrate nothing more than a standard commercial dealing involving parties representing their own interests, the Third Circuit's decision in *Highlands* fails to save Plaintiff's cause of action. Thus, because the Court cannot find that Defendants were required to disclose the alleged Powertrain Defect, Plaintiff's negligent misrepresentation claim is dismissed.

E.     RECONSIDERATION

Plaintiff also seeks reconsideration of this Court's prior Opinion. Relevant to this Motion, in the prior Opinion, the Court dismissed Plaintiff's claim under the Magnuson-Moss Warranty Act ("MMWA"). In addition, the Court found that Plaintiff lacked standing to assert claims as to the vehicles he did not lease, including the 2017-2018 Santa Fe Sport 2.0T and Santa Fe Sport 3.3L. In moving for reconsideration, Plaintiff requests as follows: (1) leave to amend his claim under the MMWA; (2) leave to amend with regard to his standing to represent the owners and lessees of the non-leased Santa Fe vehicles; and (3) leave to amend the class definition. I address each in turn.

Federal Rule of Civil Procedure 59(e) and Local Civil Rule 7.1 govern motions for reconsideration. More specifically, pursuant to Local Civil Rule 7.1(i), a litigant moving for reconsideration must "set[] forth concisely the matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked[.]" L. Civ. R. 7.1(i). Moreover, motions for reconsideration are considered "extremely limited procedural vehicle[s]." *Resorts Int'l v. Greate Bay Hotel & Casino*, 830 F. Supp. 826, 831 (D.N.J. 1992). Indeed, requests for reconsideration "are not to be used as an opportunity to relitigate the case; rather, they may be used only to correct manifest errors of law or fact or to present newly discovered evidence." *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011) (citing *Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.*, 602 F.3d 237, 251 (3d Cir. 2010)); s*ee also N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).

A "judgment may be altered or amended [only] if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest

injustice." *Blystone*, 664 F.3d at 415 (quotations omitted, alterations in original). "A party seeking reconsideration must show more than a disagreement with the Court's decision, and 'recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'" *G-69 v. Degnan*, 748 F. Supp. 274, 275 (D.N.J. 1990) (citations omitted). In other words, "a motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple." *Tischio v. Bontex, Inc.*, 16 F. Supp. 2d 511, 533 (D.N.J. 1998) (citation omitted). Rather, a difference of opinion with the court's decision should be dealt with through the appellate process. *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, 680 F. Supp. 159, 162 (D.N.J. 1998). Finally, the Court will only grant such a motion if the matters overlooked might reasonably have resulted in a different conclusion. *Bowers v. NCAA*, 130 F. Supp. 2d 610, 613 (D.N.J. 2001).

In seeking reconsideration, Plaintiff first disputes the dismissal of his MMWA claim. As a threshold matter, however, I note that Plaintiff does not advance a valid ground for reconsideration, such as a change in law, new evidence, or manifest error. Rather, he contends that he now states a cognizable cause of action under the MMWA, on the basis of his amended allegations. Thus, while Plaintiff's request can be denied on these grounds alone, *see Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co.*, 744 F. Supp. 1311, 1314 (D.N.J. 1990) (explaining that "[a] motion for reconsideration is improper when it is used to ask the Court to rethink what is had already thought through—rightly or wrongly") (internal quotations and citation omitted), the FAC still fail to state a viable MMWA claim.

As discussed in the initial decision, the MMWA provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract,

may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1).

Relevant here, in a putative class action complaint, the pertinent provisions of the MMWA state

that "a class of consumers may not proceed in a class action . . . unless the named plaintiffs

initially resort to such [informal dispute settlement] procedures." *Sheris v. Nissan N. Am. Inc.*,

No. 07-2516, 2008 U.S. Dist. LEXIS 43664, at *22 (D.N.J. June 3, 2008) (citing 15 U.S.C. §

2310(a)(3)(C)(ii)) Therefore, "where the warrantor has provided a valid informal dispute

resolution mechanism, a claimant must first exhaust that mechanism before filing a Magnuson-

Moss claim." *Id*.

Here, Plaintiff does not dispute that Defendants required, but he failed to adhere to,

certain dispute resolution procedures before commencing this putative class action suit.

Nonetheless, Plaintiff contends that he was not obligated to pursue the informal resolution

procedures, because he avers that such efforts would have been futile. Moreover, to support that

contention, in the amended complaint, Plaintiff alleges that Defendants did not remediate his

vehicle's Powertrain Defect, and when he reported the issue to a "Hyundai corporate

representative, Hyundai offered him $450.00 to settle [his] claim."[10] FAC, ¶¶ 39-40 (internal

quotations omitted). Therefore, according to Plaintiff, "Defendants failed to provide Plaintiff

with an adequate remedy to the Powertrain Defect." FAC, ¶ 40. However, Plaintiff's position is

without merit.

As I explained in the prior Opinion, the Third Circuit has not recognized a futility

exception within the context of a MMWA claim, nor has any federal district court in this Circuit.

---

[10]     Defendants move to strike this allegation from the FAC pursuant to Federal Rule of Evidence 408, because, according to Defendants, it "refer[s] to [an] effort[] to compromise." Defendants' Dismissal Motion, at 20-21. However, for the reasons provided below, the alleged $450 offer, nonetheless, fails to provide an adequate basis in support of Plaintiff's request for reconsideration, and therefore, Defendants' motion to strike this allegation from the FAC is moot.

In fact, Plaintiff does not cite to a single case that shows otherwise, as he, instead, continues to reference out-of-circuit, non-binding authorities that are insufficient to establish a "clear error of law." *Blystone*, 664 F.3d at 415. Nonetheless, even if such an exception were applicable, Plaintiff's amended allegations still fail to demonstrate that the required dispute resolution procedure would have been futile. Indeed, while Plaintiff relies on the representations of a "corporate representative" who offered him "$450.00 to settle his claim," this additional allegation does not suffice to establish the purported ineffectiveness or inadequacies of Defendants' available dispute resolution procedures. In fact, the settlement offer is irrelevant to the issue of exhaustion. Nowhere does Plaintiff explain that Defendants would not have participated in the dispute resolution process in good faith simply because they made an alleged settlement offer. Therefore, Plaintiff's motion for reconsideration as to his MMWA claim is denied.[11]

As to Plaintiff's request for leave to amend the class definition, he seeks to represent the following multi-state group of consumers: "[a]ll persons or entities that purchased, lease, leased, own or owned a 2017-2018 Hyundai Santa Fe or Santa Fe Sport in the states of Minnesota, New Jersey, Washington, Missouri, California, Florida, Massachusetts, Illinois, Michigan, and in the state of New York through the date of class notice, excluding persons who purchased for the

---

[11]    Citing *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1235 (S.D. Fla. 2014), an out-of-circuit, non-binding case, Plaintiff argues the Court is precluded from dismissing his MMWA claim, because "the availability of an informal dispute resolution process is an affirmative defense." However, this argument and the referenced out-of-circuit, non-binding decision were not raised in Plaintiff's initial opposition, and therefore, his request for reconsideration on this basis is improper. *In re Human Tissue Prods. Liab. Litig.*, No. 06-135, 2009 U.S. Dist. LEXIS 66619, at *44 (D.N.J. June 1, 2009) (explaining that, on reconsideration, a litigant is precluded from "introduc[ing] new arguments and new caselaw that could have been addressed in [a] moving brief."). Nevertheless, because Plaintiff's non-compliance with the required pre-suit dispute resolution procedure is clear from face of the FAC and from his own concession, the Court can adjudicate this issue now. *See Oleson v. Bureau of Prisons*, 411 Fed. Appx. 446, 447 (3d Cir. 2011).

purpose of resale." Plaintiff's Reconsideration Motion, at 10. However, as a procedural matter, I note that a motion for reconsideration is not an appropriate vehicle to both propose and seek leave to represent, for the first time, a new class definition of multi-state consumers. Nonetheless, and more importantly, the Court has rendered a choice-of-law determination above, and, for those same reasons, holds that Plaintiff cannot assert consumer protection claims under the laws of states in which he does not reside, including those identified in the proposed class definition. *See Dzielak*, 26 F. Supp. 3d at 332 ("A Plaintiff may bring state law claims only under the law of the state where he or she lived and the alleged injury occurred."); *see also McGuire v. BMW of N. Am., LLC*, No. 13-7356, 2014 U.S. Dist. LEXIS 77009, at *17 (D.N.J. Jun. 6, 2014). Thus, Plaintiff's request for leave to amend the class-definition to include a multi-state consumer group is denied.[12]

As to Plaintiff's final request, as I explained in the initial Opinion, "[a] plaintiff may have standing to assert claims on behalf of putative class members regarding products [he] did not personally purchase where (1) the basis of the claims is the same, (2) the products are closely related, and (3) the claims are against the same defendants." *See Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1088-89 (3d Cir. 1975); *Cannon v. Ashburn Corp.*, No. 16-1452, 2016 U.S. Dist. LEXIS 169040, at *9 (D.N.J. Dec. 7, 2016); *Stewart v. Smart Balance, Inc.*, No. 11-6174, 2012 U.S. Dist. LEXIS 138454, at *47 (D.N.J. June 25, 2012). However, for the reasons stated above, Plaintiff has not alleged that the Santa Fes all have similar powertrain components and defects,

---

[12]     Nonetheless, I note that Plaintiff is not precluded from filing a formal application to amend the class definition, if appropriate.

and therefore, he lacks standing to represent the owners and lessees of models of vehicles, other than the model or similar model he leased, at this juncture.[13]

III.    CONCLUSION

For the reasons expressed herein, Defendants' Motion to dismiss is **GRANTED** and their Motion to strike is **DENIED** as moot; Plaintiff's Motion for reconsideration is **DENIED**. Plaintiff is given leave to submit one last amended complaint as to his NJCFA claim addressing the pleading deficiencies noted herein, within 40 days from the date of this Opinion.


**DATED**:  March 31, 2020

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. Chief District Judge

---

[13]    For clarification purposes, I note that, in the prior Opinion, the Court dismissed claims relating to the 2017-2018 Santa Fe Sport 2.0T and the 2017-2018 Santa Fe Sport 3.3 for lack of standing on the part of Plaintiff. As such, he is only permitted to represent 2017-2018 Santa Fe 2.4L owners and lessors.  Additionally, I note that in the event Plaintiff successfully alleges the element of Defendant's knowledge in the context of his NJCFA claim, Plaintiff may then have standing to bring suit on behalf of consumers who owned or leased Santa Fe vehicles that suffer from similar powertrain issues as the model that Plaintiff leased.